UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID ALLEN DALRYMPLE,<br><br>                    Petitioner,<br><br>         v.<br><br>TIMOTHY WENGLER, WARDEN,<br><br>                    Respondent. | Case No. 1:10-CV-00494-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Petitioner David Allen Dalrymple (Petitioner) filed a Petition for Writ of Habeas Corpus on September 30, 2010. Both parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 6, 7.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Pending before the Court are both parties' Motions for Summary Judgment. (Dkt. 14, 15.) Having fully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, in the interest of avoiding delay, the Court will decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

Petitioner lived with his girlfriend, Shelley, and Shelley's minor daughter, K.B., for approximately three years. Near the end of their relationship, Petitioner had been using methamphetamine. (State's Lodging A-4, pp. 320-21.) On October 5, 2003, while Petitioner was under the influence of methamphetamine, Petitioner and Shelley had an argument, during which Petitioner handcuffed Shelley behind her back, pinched her breast, and pulled her into a bathroom. During this scene, Shelley called for her daughter to run for help. K.B., who was 11 years old at the time of the incident, tried to escape, but Petitioner caught her, physically restrained her, and pulled her through the house, during which time K.B.'s head hit the bathroom door. Petitioner would not allow Shelley or K.B. to leave the home, and he pulled a telephone cord out of the wall after K.B. called 911. *State v. Dalyrmple*, 167 P.3d 765, 769 (Idaho 2007); (State's Lodging B-19, A-4).

After the October 5, 2003 incident, K.B. told her mother that Petitioner had been repeatedly abusing her sexually for three years. The child described how Petitioner "would show her pornographic magazines and videos, would pose her in sexually suggestive positions, and would touch her over her body with his hands, tongue, and penis." *Dalrymple*, 167 P.3d at 769. The child also reported that Petitioner "would also handcuff and tie up K.B. with rope, all while imploring her not to tell her mother." (*Id*.)

As a result of all of these incidents, Petitioner was arrested, tried, and convicted after trial by jury of two counts of lewd conduct with a minor, two counts of kidnaping, sexual abuse of a minor, domestic battery, injury to a child, intentional destruction of a

**MEMORANDUM DECISION AND ORDER - 2**

telecommunication line, and two counts of violation of a no-contact order, in the Fourth

Judicial District Court in Ada County, Idaho.

Petitioner's claims arise from his disagreements with trial counsel over defense

strategy and evidence. The Idaho Supreme Court summarized the trial court proceedings

as follows:

> In February and March 2004, Dalrymple filed several motions to
> disqualify his public defender and on April 7, 2004—approximately six
> weeks before trial—the district court heard the motions. Dalrymple
> expressed dissatisfaction with his attorney on a number of grounds,
> including a belief that his attorney was not looking for exonerating
> evidence. The district court found that Dalrymple's attorney met
> professional standards and denied the motions to disqualify. Dalrymple then
> inquired about representing himself. The district court warned him of both
> the potential consequences of representing himself and the benefits of
> retaining counsel. Dalrymple indicated he understood the pitfalls of
> proceeding pro se, stating that it would be "foolish" to represent himself,
> and chose to keep his attorney for trial.
>
> After close of the evidentiary phase of the trial, Dalrymple sought the
> court's permission to present an additional defense that his attorney had not
> presented. He wished to argue that he used hypnotherapy on K.B. to
> convince her that he had molested her, when in fact no molestation had
> occurred. His attorney claimed to lack the proper foundation to raise this
> hypnosis defense, even after an investigation, and that it would be
> "tantamount to just asking the jury to come back with a guilty verdict."
> According to his attorney, Dalrymple had no training or education in
> hypnosis. Moreover, in the course of the investigation, one of Dalrymple's
> brothers told the defense investigator that he never heard him discuss
> hypnosis. Another brother was vague, stating that he may have heard about
> Dalrymple performing hypnosis at a barbecue but provided no further
> details to substantiate Dalrymple's claim.
>
> The district court allowed Dalrymple two options: either to proceed to
> closing arguments without presenting his defense or to reopen the case,
> discharge his attorney, and present his hypnosis defense pro se. At that
> time, the district court alerted Dalrymple that he would be subject to

**MEMORANDUM DECISION AND ORDER - 3**

cross-examination and would make his own closing argument, but offered no other warnings about the risks of representing himself. Dalrymple chose to discharge his attorney, who remained as standby counsel, and the case was reopened. Later, after closing arguments, the district court made findings on the record that Dalrymple had received full warnings about representing himself at the April 7 pretrial hearing.

Dalrymple testified first. When he began to explain hypnosis to the jury, the prosecutor objected, citing a lack of foundation. In sustaining the objection, the district court told him that he would need to establish his qualifications before testifying further on the practice of hypnosis. The district court permitted him to testify about what actions he took to hypnotize K.B. After his testimony, Dalrymple recalled Shelley to testify. He then sought to recall K.B. but the district court refused, stating that she was released from her subpoena and was at school. The district court allowed Dalrymple to make an offer of proof as to how he believed K.B. would testify, namely that he had gone through hypnotherapy with her over the past three years. The jury convicted Dalrymple on all charges. On the felony counts, the district court sentenced Dalrymple to two unified terms of twenty years fixed with an indeterminate life sentence for each count of lewd conduct, fifteen years fixed for the count of sexual abuse, and ten years fixed for each count of kidnaping.

*Id*. at 769-70. Judgment of conviction was entered on November 1, 2004.

After conviction, Petitioner pursued a direct appeal. The Idaho Court of Appeals determined that, on the record before the court, there were insufficient findings that Petitioner was "aware of his rights and of the consequences of waiving his right to counsel." (State's Lodging B-4, p. 8.) As a result, the court determined that Petitioner's waiver of his Sixth Amendment right to counsel was invalid, because of the lack of findings showing the waiver was knowing, intelligent, and voluntary. (*Id*.) The Idaho Court of Appeals vacated the judgment and remanded the case for a new trial. The Idaho Supreme Court granted the State's petition for review in the case and affirmed the

**MEMORANDUM DECISION AND ORDER - 4**

conviction. (State's Lodging B-14.)

Petitioner's federal Habeas Corpus Petition contains two claims arising from his direct appeal: (1) that the waiver of Petitioner's Sixth Amendment right to counsel was not made knowingly, voluntarily, or intelligently; and (2) that he was deprived of his right to present evidence in his favor and present a complete defense. Each party asserts entitlement to summary judgment in this case.

## MOTIONS FOR SUMMARY JUDGMENT

**1.    Standard of Law**

Summary judgment is appropriately granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure. Rule 11, Rules Governing Section 2254 Cases. Accordingly, summary judgment motions are appropriate in habeas corpus proceedings where there are no genuine disputes as to any material facts and the moving party is entitled to judgment as a matter of law. *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977). Judicial notice will be taken of the court docket in the underlying state court proceedings. Fed. R. Evid. 201(b); *Dawson v Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment only when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28

**MEMORANDUM DECISION AND ORDER - 5**

U.S.C. § 2254(a). Under § 2254(d), as amended by the Anti-terrorism and Effective

Death Penalty Act (AEDPA), federal habeas corpus relief is further limited to instances

where the state-court adjudication of the merits:[1]

1.  resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

2.  resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
    state court proceeding.

When a party contests the state court's legal conclusions, including

application of the law to the facts, § 2254(d)(1) governs. That section consists of

two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, for a decision to be "contrary to" clearly established federal

law, the petitioner must show that the state court applied "a rule of law different

from the governing law set forth in United States Supreme Court precedent, or that

the state court confronted a set of facts that are materially indistinguishable from a

decision of the Supreme Court and nevertheless arrived at a result different from

the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1), the petitioner must show that the state court was "unreasonable in

applying the governing legal principle to the facts of the case." *Williams*, 529 U.S.

---

[1]A state court need not "give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

**MEMORANDUM DECISION AND ORDER - 6**

at 413. A federal court cannot grant relief simply because it concludes in its

independent judgment that the decision is incorrect or wrong; the state court's

application of federal law must be objectively unreasonable to warrant relief.

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694

(2002).

  In *Harrington v. Richter*, 131 S.Ct. 770 (2011), the United States Supreme

Court reiterated that a federal court may not simply re-determine a claim on its

merits after the highest state court has done so, just because the federal court

would have made a different decision. Rather, the review is necessarily deferential.

The Supreme Court explained that, under § 2254(d), a habeas court (1) "must

determine what arguments or theories supported or . . . could have supported, the

state court's decision;" and (2) "then it must ask whether it is possible fairminded

jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of this Court." *Id*. at 786. If fairminded jurists could

disagree on the correctness of the state court's decision, then a federal court cannot

grant relief under § 2254(d)(1). *Id*. The Supreme Court emphasized: "It bears

repeating that even a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." *Id*. (internal citation omitted).[2]

---

[2] A federal habeas court can look only to the record before the state court in reviewing a state
court decision under section 2254(d)(1). *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011) ("If a claim
has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the
limitation of § 2254(d)(1) on the record that was before that state court.") (footnote omitted); *Holland v.
Jackson*, 542 U.S. 649, 652 (2004) ("[W]e have made clear that whether a state courts decision was

**MEMORANDUM DECISION AND ORDER - 7**

2.      **Claim One: Waiver of Right to Counsel**

In Claim One, Petitioner alleges his Sixth Amendment right to counsel was violated because the trial court coerced him into waiving his right to counsel by forcing him to "choose between his constitutional right to counsel and his constitutional right to testify." (Dkt. 1, pp.2-3.) Petitioner further asserts that his waiver of the right to counsel was involuntary, "because at the time of the waiver, he did not have full awareness of the rights and consequences of waiving counsel and/or the record does not show that he appreciated the risks of proceeding pro se." (Dkt. 1, p.2.)

A.      *Standard of Law Governing Waiver Claim*

A criminal defendant has a Sixth Amendment right to waive counsel and represent himself. *Faretta v. California*, 422 U.S. 806, 807 (1975). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819-20. Based on these foundational principles, the United States Supreme Court reasoned and concluded in *Faretta*:

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the

_____

unreasonable must be assessed in light of the record the court had before it.") (citations omitted).

**MEMORANDUM DECISION AND ORDER - 8**

> record will establish that "he knows what he is doing and his choice
> is made with eyes open."

422 U.S. at 835 (internal citations omitted).

In *Faretta*, the Supreme Court found that the state court record showed Faretta "clearly and unequivocally declared to the trial judge that he wanted to represent himself," and that Faretta was "literate, competent, understanding, and that he was voluntarily exercising his informed free will." *Id*. at 835. The *Faretta* Court pointed out that the trial judge had warned Faretta that "he thought it was a mistake not to accept the assistance of counsel," and that he would be "required to follow all of the 'ground rules' of trial procedure." *Id*. Finally, the Supreme Court noted that whether Faretta had an adequate technical knowledge of legal principles such as the hearsay rules or the jury selection process "was not relevant to an assessment of his knowing exercise of the right to defend himself." *Id*.

In *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004), the United States Supreme Court emphasized that, to be valid, a waiver of the right to counsel must be knowing, voluntary, and intelligent. In *Tovar*, the Court further elaborated that there was no specific formula a trial court must follow to meet the "knowing, voluntary, and intelligent" standard:

> We have not, however, prescribed any formula or script to be read to
> a defendant who states that he elects to proceed without counsel. The
> information a defendant must possess in order to make an intelligent
> election, our decisions indicate, will depend on a range of
> case-specific factors, including the defendant's education or
> sophistication, the complex or easily grasped nature of the charge,

**MEMORANDUM DECISION AND ORDER - 9**

and the stage of the proceeding.

541 U.S. at 88 (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

In *Patterson v. Illinois*, 487 U.S. 285 (1988), the Supreme Court further clarified the meaning of *Faretta*'s admonition that the defendant must be made aware of and understand "the dangers and disadvantages of self-representation." The *Patterson* Court advised trial courts to use a "pragmatic approach to the waiver question," based on "what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage," in order "to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized." *Id.* at 298. Less rigorous warnings are required when trial is not imminent–in *Patterson*, a standard Miranda warning by a prosecutor and police officer was sufficient in a post-indictment questioning setting. *Id.* at 293. Similarly, some procedures, such as a "postindictment photographic display identification," do not require warnings at all, "because this procedure is not one at which the accused requires aid in coping with legal problems or assistance in meeting his adversary." *Id.* at 298 (internal citation and punctuation omitted).

However, at the trial stage, more rigorous warnings are necessary, because the dangers and disadvantages of self-representation are more substantial and less obvious to the accused. *Tovar*, 541 U.S. at 90. "The information a defendant must

**MEMORANDUM DECISION AND ORDER - 10**

possess in order to make an intelligent election," the Supreme Court again emphasized, "will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Id*. at 88.

Because "[t]here is a presumption against the waiver of constitutional rights," *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (internal citation omitted), the State bears the burden to prove "an intentional relinquishment or abandonment of a known right or privilege." *Brewer v. Williams*, 430 U.S. 387, 404 (1977) (internal citation omitted). "This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings." *Id*. (internal citation omitted).

The law is also clear that, under the Sixth Amendment, "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "A defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process,'" and "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," so long as the rules are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Id*. (citing *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)).

**MEMORANDUM DECISION AND ORDER - 11**

**B.**   *Discussion of Waiver Claim*

The Idaho Supreme Court determined that Petitioner's Sixth Amendment

right to counsel and to testify on his own behalf were not violated. Citing *Faretta*

and *Scheffer*, the Idaho Supreme Court looked to the entire record when

considering the issue of whether the trial court violated Petitioner's Sixth

Amendment right by forcing him to choose between his right to testify on his own

behalf and his right to counsel:

> To determine if Dalrymple's waiver was constitutionally
> valid, we view the record as a whole, not just at the particular
> moment of waiver. The *Faretta* Court stated the defendant must "be
> made aware of the dangers and disadvantages of self-representation."
> 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 582. *Faretta*
> warnings, however, do not need to be given contemporaneously to
> the defendant's waiver. Instead, such warnings must be given "so
> that the record will establish that 'he knows what he is doing and his
> choice is made with eyes open.'" *Id*. (quoting *Adams v. United States
> ex. rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268,
> 275 (1942)). Therefore, the district court at a minimum must be
> satisfied that Dalrymple understood the inherent risks involved in
> waiving the right to counsel. *Hunnel*, 125 Idaho at 626, 873 P.2d at
> 880. While contemporaneous *Faretta* warnings are perhaps the most
> prudent means to ensure the defendant's grasp of the disadvantages
> of self-representation, we look to the record as a whole to determine
> if Dalrymple knowingly, intelligently, and voluntarily waived his
> constitutional right. *Lovelace*, 140 Idaho at 64, 90 P.3d at 289.
>
> Dalrymple knowingly, intelligently, and voluntarily waived
> his right to counsel. While Dalrymple asks us to consider that he
> waived his right to counsel in the heat of the moment, the entirety of
> the record shows that he understood the risks and consequences of
> self-representation. Approximately six weeks before trial, the district
> court provided Dalrymple an extensive set of *Faretta* warnings when
> he first suggested that he might proceed pro se, advising him both of

**MEMORANDUM DECISION AND ORDER - 12**

the advantages of retaining a lawyer at trial and the disadvantages of representing himself. At that time, Dalrymple declared such a waiver would be foolish. The district court told him again at trial that he was subject to cross-examination. The statements of Dalrymple's counsel at that time should have given him great pause—that the attorney, a trained professional, could not figure out how to establish a foundation for the hypnosis testimony, that the hypnosis defense "doesn't make sense to me," that presentation of the testimony would be "tantamount to just asking the jury to come back with a guilty verdict," and that he had told Dalrymple on a couple of occasions that they had "no scientific background that we could establish this." Dalrymple has a GED and went to a year of college. He testified at the pretrial hearing that he has never been diagnosed or treated for a mental illness, nor did anyone advise or threaten him not to have a lawyer. The record as a whole indicates that Dalrymple understood his rights and that he validly waived his Sixth Amendment right to counsel. A knowing and voluntary waiver is not necessarily a wise or dispassionate waiver.

(State's Lodging B-19, pp. 5-6.)

To analyze Petitioner's claim on federal habeas corpus review under § 2254(d)(1), this Court must determine whether the Idaho Supreme Court's decision was contrary to, or involved an unreasonable application of, the holdings in *Faretta*, *Scheffer*, and *Tovar*. This standard, explained in *Richter* in terms of whether fairminded jurists could disagree with the state court's decision, amounts to a rule that a petitioner is not entitled to relief unless he shows that all fairminded jurists would agree that the state court decision was wrong under the United States Supreme Court precedent governing the issue. *See Richter*, 131 S.Ct. at 786.

Nothing in the governing precedent specifically requires that the *Faretta* warning be given *contemporaneously* with the waiver, or that the trial court's

probing of the defendant or findings of waiver must follow a specific formula. However, if a warning is given early in the case, when the risk is not as high as later in the case, then whether that early warning was sufficient for the later risk must be assessed. However, the governing precedent does not address what is required when the  waiver occurs when a defendant asks to have a trial re-opened after the close of evidence, when the only tasks remaining are to put on a supplemental defense and give a closing argument. In such instance, it can be inferred from the precedent that the risks have diminished, consequently allowing for a diminished level of warning.

The first *discussions* Petitioner had with appointed counsel and the trial court occurred many months prior to trial, on February 5, 2004. (State's Lodging A-5, pp. 1-10.) Petitioner was first *warned* about the dangers and disadvantages of self-representation approximately six weeks before trial, on April 7, 2004, when the trial court held a hearing on Petitioner's motion to disqualify his public defender. (*Id*., pp 14-15.) The first warning was lengthy and detailed, because preparations for trial were coming to a close and the trial was drawing near.

During the warning, the trial court used all of the following language to describe what Petitioner would face if he represented himself: he would be at a "significant disadvantage" (State's Lodging A-5, p. 37); the advantages of having a lawyer included the fact that "the lawyer has the experience and knowledge of

**MEMORANDUM DECISION AND ORDER - 14**

the entire trial process" (*Id.*); a lawyer can "call witnesses and issue subpoenas" (*Id.*); a lawyer can "question potential jurors to make sure they are fair and impartial" (*Id.*); a lawyer can advise a client on whether to testify or remain silent (*Id.*); a lawyer can object to improper or inadmissible evidence (*Id.*); a lawyer "has studied the rules of evidence and knows what the rules of evidence are" (*Id.*); a lawyer "will argue for your side during the trial and present the best legal argument for your defense" (*Id.*); if Petitioner represented himself, he would have to "follow all of the procedural and substantive rules of criminal law" (*Id.*, p. 38); Petitioner would be "limited to the resources that are available while [he] was in custody, where[as] a lawyer has less restriction on researching [the] defense" (*Id.*); Petitioner's "access to the State's attorney will be severely reduced as compared to a lawyer" (*Id.*); the State would not go easier on him or give him special treatment because he was pro se (*Id.*); the State would present the case against him using an experienced lawyer (*Id.*); and Petitioner would not be able to speak to the victim or the witnesses, but a lawyer may be allowed to speak to them on his behalf (*Id.*, p. 39).

The state court also fully probed Petitioner's own abilities and motives for wanting to represent himself pro se: Petitioner said he understood what the court described as "very, very significant" charges against him (*Id.*); Petitioner understood that conviction could result in him spending the rest of his life in prison

(*Id.*); Petitioner could read, write, and understand English (*Id.*); Petitioner had a ninth grade education, with a GED and one year of college (*Id.*); Petitioner was not taking any medications (*Id.*, p. 40); Petitioner did not have a mental illness (*Id.*); no one told Petitioner not to use a lawyer (*Id.*); and no one threatened Petitioner if he did use a lawyer (*Id.*). After this lengthy and detailed discussion, Petitioner stated that he understood the disadvantages of representing himself and that he thought it would be "foolish" to represent himself, and, therefore, he chose to keep his attorney for trial. (*Id.*, pp. 40-41.)

Petitioner had the assistance of counsel throughout his entire case; he became pro se only after the close of evidence, at his request. Petitioner wished to present a defense that he had not molested the child at all, but, instead, he had hypnotized her, so that if they were ever separated, she would accuse him of lewd conduct, and that would cause them to be reunited, whereupon he would remove the hypnotism, and she would be able to say that he did not, in fact, commit the lewd conduct. (State's Lodging C-3, pp. 118-19.) Petitioner's counsel, Mr. DeAngelo, indicated the hypnosis defense did not make any sense to him, that there was not an adequate foundation for the defense, and that the typical juror was going to believe that, if Petitioner had the ability to make a young child make those kind of claims, he was very dangerous to the community. (*Id.*, pp. 117-119.) Petitioner's counsel also stated that neither he nor his investigator could find

**MEMORANDUM DECISION AND ORDER - 16**

grounds to present the defense, and their opinions had been discussed with

Petitioner before trial, including the fact that Petitioner was not a member of the

National Guild of Hypnotists or similar organization. (*Id.*, p.350.) Because

Petitioner's counsel did not present the hypnosis defense, at the close of evidence

Petitioner asked to have the case re-opened so that the defense could be presented

through counsel.[3]

    Petitioner had already been warned by the court that proceeding without

counsel was very risky and very difficult. Petitioner clearly understood this,

because he elected to retain counsel for trial. Petitioner was privy to counsel's

discussion about the negative and harmful aspects of the defense. (State's Lodging

A-4, p. 350.) The trial court perceived counsel's statements as "a conflict of

interest on this issue," and determined "that pursuant to the canons of ethics, for

him to go forward with such evidence . . . could conceivably be violating those

canons." (*Id.*, p. 395.) Balancing the interests at stake, the trial court determined

that Petitioner could choose to represent himself and assert the hypnosis defense,

---

[3] The Court also notes that Petitioner's dilemma was somewhat of his own making, as the state district court pointed out. (State's Lodging A-4, p. 395.) During the February 5 hearing, counsel complained that Petitioner refused to speak with him about what theory Petitioner wished to use for his defense. (State's Lodging A-5, p. 9.)  During the April 7 hearing when Petitioner wished to fire his counsel but decided to retain him, the court attempted to probe Petitioner in detail about the defense that Petitioner wished to present but refused to share with counsel. Petitioner refused to disclose the defense to the court. (State's Lodging A-5, pp. 20-24.) Had he done so, he would have had much more time and information to contemplate whether presenting his defense was a good idea.

**MEMORANDUM DECISION AND ORDER - 17**

or he could proceed to closing argument through his defense counsel, but that defense counsel would not be required to present the hypnosis defense in the face of the perceived conflict.

At that time, the court warned Petitioner that he (1) would have to testify on his own, (2) be subject to re-cross-examination, and (3) would be required to make his own closing argument. (State's Lodging A-4, pp. 354-55.) No other warnings about the dangers of self-representation were given at that time. After closing arguments, the trial court made short and general "findings" on the record of the grounds for the waiver, referring specifically to the discussions held at the earlier hearing on April 7, 2004. (*Id.*, pp. 394-95.) While Petitioner is correct that the findings were not a model of comprehensiveness and clarity, he minimizes the remainder of the record and the context of the waiver.

When Petitioner did elect to proceed without counsel, the only remaining tasks were to put on a supplemental defense on what the trial court deemed the "single issue alone" of the hypnosis defense (*Id.*, p. 395), and to make a closing argument. Counsel had carried nearly the entire weight of the trial for Petitioner, regardless of whether Petitioner disagreed with counsel's strategy.

At the time Petitioner began his self-representation, he encountered objections about foundation. (*Id.*, p. 359.) He had full awareness from the discussion with counsel and the Court about self-representation, shortly before he

**MEMORANDUM DECISION AND ORDER - 18**

made his choice, that foundation would be an issue. Despite this information, Petitioner chose to proceed with the defense anyway. When the objections to foundation arose, the trial court sustained the objections but advised Petitioner on how to lay foundation–that he must establish his qualifications before testifying about the practice of hypnosis. (*Id.*, p. 360, 365.) The trial court also permitted Petitioner to testify as a lay witness about the actions he took to hypnotize the child, which were topics within his own personal knowledge. (*Id.*, pp. 360-66.)

After Petitioner testified, he recalled Shelley to testify.  Petitioner then attempted to recall the child. The trial court refused to require the child to come back to court, because she already had been released from her subpoena and had returned to school. The district court permitted Petitioner to make an offer of proof to show that the child would have testified that he had hypnotized her at various times over the past three years. (*Id.*, 379-90.)

Petitioner's arguments on habeas corpus review serve to highlight other courses of action fairminded jurists might have taken under the circumstances of the case. However, the Court is not persuaded that all, or even most, fairminded jurists would see it Petitioner's way. The Idaho Supreme Court's opinion applies United States Supreme Court precedent to the record as a whole, while Petitioner relies on more particular law from the United States Court of Appeals for the Ninth Circuit and focuses on the lack of structured colloquy between Petitioner and the

**MEMORANDUM DECISION AND ORDER - 19**

trial court at the time of waiver or in the post-waiver findings.[4]

The Court disagrees with Petitioner's assessment that the Idaho Supreme Court failed to allocate the burden of proof to the State in its analysis and conclusion. (State's Lodging B-19.) The State met its burden of proof to show validity of the waiver by relying on the totality of the record. The record reflects that the trial court informed Petitioner of the legal tasks he would have to perform on his own if he proceeded with his defense. The record reflects that Petitioner already had sat through his entire trial at the time he decided to go ahead with presenting a dangerous defense pro se. Petitioner heard counsel's evaluation of the defense, and privately consulted with his counsel out of earshot of the judge before making his decision (State's Lodging A-4, p 355); afterwards, he decided to relinquish his right to counsel in favor of putting on a defense that counsel thought beyond imprudent.

The Idaho Supreme Court made its decision upon a record reflecting: (1) that Petitioner was actively involved in the discussions of the risks of self-

---

[4] The Court is aware that Petitioner's counsel is citing cases from the United States Court of Appeals for the Ninth Circuit as persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, rather than in place of United States Supreme Court precedent. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). Nevertheless, Petitioner's reliance on *United States v. Forrester*, 512 F.3d 500 (9th Cir. 2008), *McCormick v. Adams*, 621 F.3d 970 (9th Cir. 2010), and *United States v. Balough*, 820 F.2d 1485 (9th Cir. 1987), is misplaced because none of the circuit cases is quite like Petitioner's, where he sought a "re-do" after the close of evidence.

**MEMORANDUM DECISION AND ORDER - 20**

representation and the risks of the particular defense with counsel and the trial court, and (2) that the trial court already had probed Petitioner's ability to understand the proceedings; therefore, it cannot be said that the Idaho Supreme Court merely presumed Petitioner understood the dangers and disadvantages of self-representation at the conclusion of trial. (State's Lodging A-4, p. 342.) While other fairminded jurists might disagree and require either an express finding of the trial court that Petitioner understood the risks and consequences of self-representation or an affirmative explanation from Petitioner on the record, other jurists would find the totality of the record sufficient, as does this Court.

Petitioner further argues that he never requested an opportunity to proceed pro se, but only wanted a different attorney. What is evident from the whole record is that Petitioner was bent on pursuing a certain defense, but his counsel thought it an imprudent and harmful defense. For example, at the time of the February 5 hearing on Petitioner's pro se motion to disqualify counsel (State's Lodging A-1, p. 71; A-5), Petitioner had refused to cooperate with his counsel in preparation of a defense, and had refused to discuss with counsel his desire to present the hypnosis defense unless counsel could set up a meeting with Shelley. (State's Lodging A-5, p. 5, 9.) At that point, the judge asked Petitioner whether he wanted to proceed with the public defender or represent himself, and, after consultation with his counsel, Petitioner decided to remain with counsel. Petitioner fails to acknowledge

**MEMORANDUM DECISION AND ORDER - 21**

that a refusal to cooperate with the public defender is a circumstance that itself *invites* the question of self-representation.

At the time of the April 7 pretrial conference, the trial court indicated it had received "quite a bit of correspondence" from Petitioner about his allegations that his attorney was performing ineffectively, and the court laid out Petitioner's three options: hire a new lawyer, keep the same public defender, or represent himself. This set of choices, again, was appropriate under the circumstances, where the court found no deficiencies in counsel's representation and where Petitioner refused to discuss his defense with the trial court. (*Id*., pp. 15-24.)

Similarly, after the close of evidence, Petitioner again was given the choice of pursuing a defense that counsel thought would destroy Petitioner's chances of acquittal, or continuing to have counsel aid him with the closing argument. (State's Lodging A-4, pp. 354-55.) Because a *client* cannot force his attorney to take a course of action harmful to the client, nor can the *court* force an attorney to take a course of action harmful to his client, the natural consequence of Petitioner's failure to cooperate and his insistence on pursuing a harmful defense was to represent himself. Therefore, Petitioner is hard-pressed to argue that he never asked for, but was "forced" to accept, pro se status.

Petitioner further asserts that the allegedly coerced choice was contrary to *Rock v. Arkansas*, 483 U.S. 44 (1987), and that he should not have been forced to

**MEMORANDUM DECISION AND ORDER - 22**

choose between the right to counsel or the right to testify. While there is no doubt that Petitioner had the right to counsel *and* the right to testify, *Rock* does not stand for the proposition that Petitioner has the right to force his counsel to take up a new and detrimental defense after the close of evidence. Rather, the holding of *Rock* is that a per se rule excluding all hypnotically-refreshed testimony impermissibly infringed on a criminal defendant's right to testify on her own behalf, a different issue.

As noted above, Petitioner had full opportunity to probe his defense and share it with his attorney and with the court at the February 5 and April 7 pretrial hearings. Petitioner chose to insist on not revealing his defense or what evidence was needed for his defense unless he met with the K.B.'s mother (also a victim in the consolidated case), even though the prosecutor refused to recommend the meeting and two protective orders prohibited such a meeting. Petitioner's counsel and his investigator had not found any foundation for the defense, and so informed Petitioner prior to trial. Petitioner was well-aware that the hypnosis defense was not going to be utilized at trial, and yet he waited until after the child had been released from testifying to attempt to re-open his case.

The trial court weighed the options and did not force Petitioner to forgo his preferred defense, but provided him two reasonable choices given the procedural posture of the case and the nature of the defense he was proffering. Under the

Sixth Amendment, "a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. at 308. The trial court's decision to permit the additional defense but not require counsel to put on that defense was within the bounds of governing precedent  under the totality of the circumstances, and did not amount to a forced waiver of the right to counsel or an unconstitutional choice between the right to counsel and the right to testify. The record contains sufficient facts to support the Idaho Supreme Court's conclusion that Petitioner's waiver of the right to be represented by counsel for the presentation of the additional defense and closing arguments was knowing, voluntary, and intelligent.

Considering the overall record–especially that Petitioner's self-representation occurred *after* the close of evidence and that Petitioner was insistent on providing a nonsensical defense that he was heavily engaged in hypnotizing the child to protect her from imminent harm during the same time period he was under the influence of methamphetamine, the Court concludes that Petitioner has failed to show that the Idaho Supreme Court's disposition of this claim was contrary to, or involved an unreasonable application of, governing United States Supreme Court precedent such that habeas relief is warranted. *See Tovar*, 541 U.S. at 88 (no formulaic warning need be given).

**MEMORANDUM DECISION AND ORDER - 24**

3.     **Claim Two**

Claim Two alleges Petitioner was denied his Sixth Amendment right to present a defense "when the district court refused to allow him to recall [the victim] after his counsel was discharged and he was presenting his defense pro se." (Dkt. 1, p.5.)

A.     ***Standard of Law Governing Confrontation of Witnesses Claim***

The Sixth Amendment affords a criminal defendant the right to present a defense and confront his accusers, but, as previously noted, the right is subject to limitation and may "'in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. at 55 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). For example, a trial court may reasonably limit cross-examination that is harassing, confusing, repetitive, or only marginally relevant. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Regarding the right to examine adverse witnesses, the Supreme Court has stated that, although the "Confrontation Clause guarantees an opportunity for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

A mere deprivation of testimony does not amount to a Sixth Amendment violation; rather, it is a deprivation of *favorable* testimony that is key. *United*

**MEMORANDUM DECISION AND ORDER - 25**

*States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). In *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court held that the right to have compulsory process for obtaining witnesses in the defendant's favor was violated when "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id*. at 23.

**B.    *Discussion of Confrontation of Witnesses Claim***

Based on the evidence in the state court record, the Idaho Supreme Court determined:

> The district court did not abuse its discretion in declining to allow Dalrymple to recall K.B. for cross-examination on the hypnosis defense. In the first place, Dalrymple had been unable to lay a foundation for testimony to establish the defense. Further, Dalrymple's counsel had the opportunity to cross-examine K.B. when she initially testified. At that time the attorney attempted to impeach K.B. and asked her whether Dalrymple ever told her to make anything up or say the things to which she testified, receiving a reply in the negative. Thus, Dalrymple had his opportunity to confront this witness and there was no error in not allowing additional cross-examination after he discharged his attorney.

167 P.3d at 772.

The procedural posture of Petitioner's case is distinctly different from the procedural posture of the governing precedent. In *Valenzuela-Bernal* and *Washington*, the defendants were denied the right to compel witnesses to testify at

**MEMORANDUM DECISION AND ORDER - 26**

trial in the first instance. Here, K.B. had already testified, and Petitioner made no effort at the time of her testimony to either ask her about hypnosis or ask the trial court to allow her to be recalled at a later time. (State's Lodging A-4, p. 87-155.) In addition, without being able to lay a foundation for the testimony about hypnosis, the testimony he would have attempted to elicit from K.B. would not have been admissible. In addition, special concerns about child witnesses exist, and the trial court exercised its discretion in refusing to recall her to trial after she had been excused and already had returned to school. All of these factors weigh against Petitioner's argument.

Certainly, under similar circumstances, other trial judges might have recalled the child from school to testify. However, as explained above, Petitioner had full opportunity while the child was on the stand to bring up his hypnosis defense. He did not; nor did his attorney; nor did Petitioner attempt to raise this issue with the court at that time. This Court agrees with Petitioner that his counsel's questions to the child about whether Petitioner ever asked her to lie about being sexually abused did *not* adequately address the hypnosis defense (the theory of which was that the child was unaware that she had been hypnotized to allege abusive conduct that never happened). (State's Lodging B-19, p. 7-8; State's Lodging A-4, p. 146.) However, the Court disagrees that Petitioner did not have adequate opportunity to confront the witness in any reasonable manner he desired

**MEMORANDUM DECISION AND ORDER - 27**

while the witness was on the stand.

Petitioner also argues that the Idaho Supreme Court wrongly applied Idaho evidentiary rules to the circumstances, and that it should not have used "lack of foundation" to support a conclusion that the child's additional testimony would not have been material or favorable. (State's Lodging B-19, p. 7.) However, Petitioner's argument is directed toward showing an erroneous application of law, rather than an unreasonable application of law, which is outside the scope of habeas corpus review. *See Williams*, 529 U.S. at 411 (a petitioner cannot prevail under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.")

Particularly, Petitioner takes issue with the trial court's comment that foundation for testifying about how hypnosis works could be laid only by showing that he was "certified or qualified to discuss the subject of hypnosis . . . through educational certification or some type of professional certification, some type of course of study." (State's Lodging, p. 360.) The court did not tell Petitioner that, alternatively, he could lay foundation to show an expertise in a subject area by having adequate experience.

However, under similar circumstances, many trial judges would find that Petitioner's attempts to lay foundation for his knowledge of hypnosis were

**MEMORANDUM DECISION AND ORDER - 28**

inadequate to show that he either had training or was an expert through experience:

> At 16, I learned how to do hypnosis by watching an entertainer that was doing hypnosis. I used it. I tried it. I was amazed that it actually did work. Had quite a bit of fun with it at parties at different times. In the military, I was a driver for a man who had done – his name was Captain Dolla. I was a driver for him for about a year and he worked in some type of military intelligence and he knew a lot more about it than I did. Also during this time, I was going to Fort Steilacoom College, and I was – it was my first year in college, and I wanted to study psychology so he and I had a lot of talks about subliminal messaging and hypnosis and how to make it happen and how to make it undetectable; how to do it so that it was not detectable.

(*Id*., p. 365.)

Some of Petitioner's testimony arguably was within the purview of "expert" opinion rather than testimony based on personal experience, supporting the trial court's and the Idaho Supreme Court's conclusion that additional foundation as an expert was required. For example, Petitioner's first question to himself was, "Is hypnosis provable?" The trial court told Petitioner the question was impermissible and that he needed to lay a foundation. (State's Lodging A-4, p. 365.) Petitioner then asked himself: "How much do you know about hypnosis?" The court permitted Petitioner to testify about how he was trained in hypnosis, and he did so, as set forth in the quotation directly above. (*Id.*, pp. 365-66.) When Petitioner again asked himself: "How is what you are saying provable?," the court again ruled that such testimony was impermissible. (*Id.*, p. 366.) However, the court permitted Petitioner to testify about what procedures he used to hypnotize the child

and why he hypnotized her, such as with the court's direction: "I don't want you to give them [the jury] a discussion about how people are hypnotized. I want you to specifically related what you did to [K.B.] to hypnotize her." (*Id*., p. 361.) Petitioner so testified.

The Court agrees that the question of foundation arguably would have arisen had Petitioner been permitted to recall the child. As the prosecutor pointed out at trial, admissibility rules for "hypnotically induced testimony" were adopted in *State v. Iwakiri*, 682 P.2d 571 (1984). While Petitioner's own testimony was not an attempt to introduce "hypnotically induced testimony," the child's testimony could have reached into this difficult area, requiring foundation that Petitioner could not lay. In addition, other considerations, such as Petitioner's ability to examine the witness during his case before evidence was closed and the special circumstances involving child witnesses in sex crime cases, weigh in favor of not recalling the witness.

Based on the foregoing, the Court concludes that Petitioner has failed to show that the Idaho Supreme Court's decision is contrary to, or an unreasonable application of, United States Supreme Court precedent governing this issue. Accordingly, Petitioner is not entitled to relief under § 2254(d)(1).

**MEMORANDUM DECISION AND ORDER - 30**

## CERTIFICATE OF APPEALABILITY

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, the Court now evaluates the claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); Rule 11(a), Rules Governing Section 2254 Cases.

A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.*" Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

**MEMORANDUM DECISION AND ORDER - 31**

Here, the Court has dismissed Petitioner's claims on the merits. The Court finds that additional briefing on the COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the Court's decision on the procedural issues and the merits of the claims raised in the Petition and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action.

If he wishes to proceed to the United States Court of Appeals for the Ninth Circuit, Petitioner must file a notice of appeal in this Court, and simultaneously file a motion for COA in the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b), **within thirty (30) days after entry of this Order**.

## ORDER

**IT IS ORDERED:**

1.   Respondent's Motion for Summary Judgment (Dkt. 14) is GRANTED.

2.   Petitioner's Motion for Summary Judgment (Dkt. 15) is DENIED.

3.   Petitioner's case is DISMISSED with prejudice.

4.   The Court will not grant a Certificate of Appealability in this case. If Petitioner chooses to file a notice of appeal, the Clerk of Court is

**MEMORANDUM DECISION AND ORDER - 32**

ordered to forward a copy of this Order, the record in this case, and

Petitioner's notice of appeal, to the United States Court of Appeals

for the Ninth Circuit.



DATED: March 22, 2012

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 33**